

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/11/2010

| | | |
|---|---|---|
| IN RE: | § | |
| CYNDI STOKER, | § | Case No. 09-33976 |
| Debtor. | § | |
| | § | Chapter 13 |
| | § | |
| CYNDI STOKER, | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | Adversary No. 09-3349 |
| | § | |
| AURORA LOAN SERVICES INC, *et al*, | § | |
| Defendant(s). | § | Judge Isgur |

## MEMORANDUM OPINION

In this difficult case, the Court determines that:

- Aurora Loan Services, Inc. ("Aurora") and the Federal National Mortgage Association ("FNMA") violated the automatic stay when they foreclosed on a home that Cyndi Stoker claimed was her property; and

- The automatic stay should now be terminated based on Cyndi Stoker's failure to make payments to the chapter 13 trustee during the course of her bankruptcy case.

### Background

The home at issue in this case is located at 22 Dover Drive, Conroe, Texas 77304. During the period when Stoker was obtaining a divorce from her husband, the family court barred her from incurring any debt. Stoker arranged for her mother (Esther V. Pendleton, a resident of Washington State) to purchase the home. Pendleton had plans to move to Texas and to live with her daughter and grandchildren in the Dover Home.

Title to the home was recorded in Pendleton's name. Pendleton financed the acquisition with a loan in the amount of $113,600 from Cornerstone Mortgage Company. The loan was secured by a first lien deed of trust against the home. The closing occurred on February 13,

2007.  Because Pendleton was in Washington State, the loan documents were executed pursuant to a power of attorney granted by Pendleton to Stoker.  Cornerstone accepted the power of attorney and no person challenges its validity.

The power of attorney had a limited duration.  It was valid only from February 2, 2007 through March 4, 2007.

Unbeknownst to Cornerstone, the down payment on the home was paid by Stoker.  The few payments that were made on the $113,600 loan were made by Stoker.  Stoker claims that she and Pendleton agreed that the home was to belong to Stoker once Stoker's divorce was completed.  There is no writing to support that contention.[1]

Shortly after the acquisition of the home, Pendleton broke her hip and was unable to move to Texas.  By November, 2007, Pendleton had developed Alzheimer's disease and was no longer able to handle her own affairs.  By July, 2008, Pendleton could no longer recognize her daughter.

Cornerstone sold the loan to FNMA.  The loan servicer is Aurora.  At all relevant times, Aurora has acted as FNMA's agent for the loan.

For a variety of reasons (ranging from illness to back injury to unemployment), Stoker made very few payments to Aurora.  Pendleton made none.

### The Workout Period

After Stoker failed to make payments to Aurora, she attempted to work through the financial difficulties with Aurora.  As set forth in more detail below, Aurora was remarkably patient and cooperative and Stoker was remarkably irresponsible.

---

[1]  Pendleton is not a party to this adversary proceeding.  The Court will not resolve any title dispute that may exist between Pendleton and Stoker.

The workout arrangements, although eventually committed to writing, were negotiated in a series of telephone calls between Aurora and Stoker.

## 1.  Adverse Inference

At a deposition taken pursuant to a Court order issued against Aurora on Stoker's motion to compel Aurora to provide relevant discovery, Aurora's witness testified that all of the telephone conversations were recorded.

Prior to the deposition, Stoker had filed a motion to compel discovery that was granted by the Court.  The Court ordered Aurora to produce missing documents.  Aurora did not inform its attorney that the recordings existed; thus, they were not produced.  The disclosure of the missing tapes was made:  (i) after the discovery cutoff date; (ii) after the Court had ordered Aurora to supplement its production with all missing documents; and (iii) after the relevant witnesses had already been deposed.

Although the Court's discovery order did not specify that the tapes should be produced, that is because their existence had not yet been disclosed.  After the deposition, Aurora still did not produce the tapes.

In determining the appropriate sanction, the Court is mindful that an adverse inference should only be drawn if bad faith conduct has been shown.  *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975).  When the issue arises at such a late date that the production failure interferes with the trial, the Court should carefully exercise its discretion:

> Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction.

*Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2nd Cir. 2002).

Trial was long scheduled and the Court did not learn of the missing tapes until the day of the trial.  If the trial were delayed to allow the tapes to be produced, it is likely that the majority of the depositions would have to be retaken.  Given the amount at issue in this case and the cost of the additional depositions, the Court found that an adverse inference was the most appropriate remedy.  Accordingly, the Court will infer that the unproduced recordings support Stoker's version of what occurred in the phone conversations and will disregard any contrary characterization of the telephone calls that is contained in Aurora's written records.

## 2.  The Power of Attorney and Oral Discussions

There were numerous telephone conversations between Stoker and Aurora.  When the workout phase began, Aurora would require Stoker to prove that she was authorized to speak for her mother.  Stoker told Aurora that she had signed the loan documents pursuant to a power of attorney.  Aurora confirmed that fact.  Aurora did not discover—and Stoker did not volunteer—that the power of attorney had expired by its own terms.

After several instances in which Aurora required Stoker to demonstrate her *bona fides* based on the power of attorney, the relationship evolved.  Aurora began discussing the loan with Stoker without hesitation.

During those telephone conversations, Stoker informed Aurora that Pendleton suffered from Alzheimer's and that Stoker was the one making any payments on the loan.  Stoker also orally advised Aurora that Stoker was the true owner of the home.

Although Stoker claimed to be the homeowner, Aurora could not and did not change its records to reflect Stoker's claim.  Legal title remained in Pendleton's name and Aurora was never provided with any documentation to reflect a change in legal title to the Dover Home.

When Aurora agreed to enter into workout arrangements, the documents were provided to Stoker for execution by Pendleton.  Stoker would execute the document for Pendleton by using the expired power of attorney.  Aurora accepted the documents from Stoker with the defective signature.

Aurora would also require that financial information be provided.  Stoker would provide financial information about herself, but the financial statements were in the name of "Esther Pendelton/AIP Cyndi Stoker."  The back up documents (social security statements and the like) were all in Stoker's name only.

Aurora maintained written notes of all of the telephone conversations.  A review of the written records reflects that Aurora had actual knowledge that Stoker was the principal person involved with the home, but may not have recognized that Stoker claimed equitable title to the home as well.

**3.  Stoker's Performance**

From March, 2007 through February, 2010 (a total of 36 months), Stoker made only the following payments on the loan:

| Date | Amount Paid |
|---|---|
| March 15, 2007 | $1,538.56 |
| April 4, 2007 | $1,218.20 |
| June 18, 2007 | $2,478.08 |
| October 2, 2007 | $100.00 |
| December 4, 2007 | $700.00 |
| February 20, 2008 | $100.00 |
| February 22, 2008 | $100.00 |
| May 12, 2008 | $221.12 |

Accordingly, over three years, Stoker made only four full monthly payments.  Between May, 2008 and June, 2009, she made no payments.  Stoker filed two bankruptcy cases.  Her first petition was filed on August 4, 2008.  That petition was dismissed on November 19, 2008.

During the three and one-half month duration of that case, Stoker made no payments.  Her schedules, filed on September 16, 2008, reflected that she was employed and received social security income, disability income (for her minor son) and food stamps.  She claimed disposable income of $1,676.00.  Stoker filed her second bankruptcy petition on June 2, 2009.  Her first trustee payment was due on July 2, 2009.  11 U.S.C. § 1326(a)(1).  Between July 2, 2009 and March 2, 2010 (a total of 9 months), Stoker made less than half of the payments due to the Trustee.  She has made no payments to the Trustee since October 21, 2009.

The Court contrasts Stoker's abysmal performance with Aurora's good faith attempts to forebear from foreclosing on the home.  Aurora entered into four separate forbearance agreements with Pendleton/Stoker.  Some of these only required a monthly good faith payment of $100.00 per month.  Stoker never made more than two forbearance payments under any agreement with Aurora and made no payments under some of the forbearance agreements.

Aurora did not penalize Stoker for her first failure to honor a minimal payment workout.  Or for her second failure.  Or for her third failure.  After each of these failures, Aurora willingly entered into a new workout agreement.  Some of these were based on a back injury suffered by Stoker; later agreements were merely because Stoker was "over extended."  Each time that Aurora would make an accommodation for Stoker, Stoker would default.  When she requested a fifth workout, Aurora refused.  The Court is astonished that Stoker complains about Aurora's refusal to enter into a fifth agreement with her.  But, the record reflects her belief that this decision was unreasonable.

Exasperated with Stoker's failure to make even good faith payments, Aurora understandably proceeded to foreclose on the home and refused to enter into a fifth forbearance agreement. **The Foreclosure**

Stoker filed her first bankruptcy petition on August 4, 2008.  On August 5, 2008, Aurora and FNMA foreclosed on the Dover Home.  The foreclosure occurred after Aurora and FNMA confirmed that Stoker's bankruptcy petition had been filed.

The parties stipulate that the foreclosure of the Dover Home was noticed and conducted in accordance with Texas law.  The sole issue pertaining to the foreclosure is whether it is void under federal bankruptcy law based on *Chesnut*.  *Brown v. Chesnut,* 422 F.3d 298 (5th Cir. 2005).  *Chesnut* holds that the automatic stay arising under § 362 applies to property that is *arguably* property of the estate.  *Id.* at 304.  Under *Chesnut,* lien holders like Aurora are stayed from proceeding with a foreclosure in order to allow the bankruptcy court to sort out the competing claims to property.  *Id.*  Without this needed breathing spell, property could be foreclosed before the bankruptcy court would have an opportunity to determine whether the property was *actually* property of the estate.

The facts of *Chesnut* are remarkably similar to those in the present case.  Mrs. Chesnut purchased acreage in her own name and originally intended for the property to be her separate property.  *Id.* at 300.  Mr. Chesnut filed a chapter 13 bankruptcy petition, invoking the automatic stay under § 362.  *Id.* at 300-01.  Ordinarily, the automatic stay would not apply to Mrs. Chesnut's separate property.  *See* 11 U.S.C. § 541(a)(2).  Although title had never passed to the community, Mr. Chesnut alleged that the acreage had been contributed into the community estate.  *Chesnut,* 422 F.3d at 300-01. The automatic stay does apply to community property.  11 U.S.C. § 541(a)(2).  As in Stoker's case, Mr. Chesnut had not filed his bankruptcy schedules

prior to the planned foreclosure.  The lender proceeded with the foreclosure of the acreage under

the theory that the separate property was not protected by the automatic stay.  *Chestnut*, 422 F.3d

at 301.  The foreclosure was voided by the bankruptcy court.  *Id.*  The District Court reversed,

based on a determination that the property was, in fact, separate property.  *Id.*  The Fifth Circuit

reversed the District Court, holding that:

> The Eastland property was not clearly part of Mr. Chesnut's bankruptcy
> estate at the time of the foreclosure, but neither was it clearly not part of his
> estate. Whether an asset is property of the estate is a legal determination
> which frequently entails complex analyses involving a number of legal
> elements and a variety of facts. Here, the status of the Eastland property
> hinged on the application of Texas's legal presumptions regarding separate
> and community property as well as an examination of the factual bases
> underlying the transaction, including the text of the title documents, the
> source of purchasing funds, and even the possible existence of fraud. These
> questions concerning the characterization of the Eastland property as
> separate or community property can only be answered with finality through
> the judicial process, which was not initiated here until after the foreclosure
> of the Eastland property. Regardless of whether the Eastland property is
> ultimately held to have been Mrs. Chesnut's separate property or the
> Chesnuts' community property, at the time that Brown foreclosed on the
> Eastland property, it was uncertain whether it was property of Mr. Chesnut's
> estate and, therefore, was arguable property.

*Id.* at 303.

Although the Fifth Circuit held that the automatic stay applies to property that is

"arguably" estate property, the holding was limited.  "Not every bankruptcy petition, with an

attendant claim of a right in property, will transform what is obviously not property of the estate

into arguable property that is subject to process requirements. Nevertheless, given the

considerations above, we are convinced that this is one such instance."  *Id.* at 306.  This Court

interprets *Chesnut* to apply when there is a colorable argument as to whether property belongs to

the bankruptcy estate.  *In re Chesnut,* 400 B.R. 74, 82 (N.D. Tex. 2009), *aff'd*, No. 09-10145,

2009 WL 4885018 (5th Cir. Dec. 17, 2009)) ("The Fifth Circuit used 'arguable claim of right' to

the property in the same sense the 'colorable claim to that piece of property' concept was used by the bankruptcy court.") (quoting *Chestnut*, 422 F.3d at 300)).  Accordingly, the Court must determine whether Stoker's argument that she owns the Dover Home has a colorable basis in the law.

Stoker claims an equitable interest in the home based on the unwritten agreement with her mother, the fact that she made all of the payments on the home, and the fact that Aurora was informed by Stoker that Stoker claimed to be the owner of the home.

In order to prevail in a claim of equitable ownership of real estate in Texas, a plaintiff must demonstrate "a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon the performance of specified conditions."  *City of Houston v. Guthrie,*  ---S.W.3d---, No. 01-08-00712-CV, 2009 WL 5174258 (Tex. App.—Houston [1st Dist.] Dec. 31, 2009, no pet.).  If Stoker's claim regarding her understanding with her mother is true, then she has a claim for equitable title.  *See Yarto v. Gilliland,* 287 S.W.3d 83, 89-90 (Tex. App.—Corpus Christi 2009, no pet.).  Stoker's position does not appear to be frivolous.  It is undisputed that (i) she was the sole occupant of the home; (ii) she paid the down payment and the mortgage payments; (iii) she held herself out as the owner of the home; and (iv) she paid no compensation to her mother for living in the home.

Under these circumstances, Stoker raises a colorable claim to equitable title to the Dover Home.  *See Troxel v. Bishop,* 201 S.W.3d 290, 300 (Tex. App.—Dallas 2006, no pet.).  The dispute, if there is one, as to equitable title is between Stoker and her Mother, Pendleton.  This Court will not resolve that dispute without notice to Pendleton.  Aurora and FNMA, of course, do not allege that they held equitable title to the property prior to the foreclosure proceedings.

Because Stoker arguably holds equitable title to the property, the automatic stay precluded Aurora and FNMA from proceeding with the foreclosure sale. *Chesnut,* 422 F.3d at 303.

### Willfulness of Violation

Section 362 of the Bankruptcy Code provides remedies for both willful and non-willful violations of the automatic stay. As set forth in more detail below, the Court concludes that Aurora and FNMA willfully violated the automatic stay when they foreclosed on the Dover Home.

> A willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*Campbell v. Countrywide Home Loans, Inc.,* 545 F.3d 348, 355 (5th Cir. 2008) (quoting *Chesnut,* 422 F.3d at 302). If a stay violation is willful, the Court must award actual damages, including legal fees and costs, and may award punitive damages.

FNMA and Aurora do not meaningfully contest that they intentionally foreclosed on the Dover Home after receiving actual knowledge of the commencement of the bankruptcy case. Indeed, Stoker's counsel communicated directly with Aurora's attorney and informed the attorney that Stoker had filed chapter 13 bankruptcy and that she claimed an interest in the Dover Home. Shirking his duties as counsel, Aurora's lawyer left the foreclosure decision up to his client. The client's decision was made by a paralegal. The paralegal employed by Aurora determined that Aurora was not bound by the automatic stay because Aurora's contract was only with Pendleton and because record title was with Pendleton. No consideration was given to whether there was a colorable argument that the Dover Home was estate property.

In light of *Chesnut*—a Fifth Circuit opinion discussed at multiple continuing education conferences and of which Aurora's counsel was undoubtedly aware—the decision to proceed with the foreclosure is shocking.  Moreover, the Court is concerned that a licensed Texas attorney would proceed with a stayed foreclosure based on the decision of an out-of-state paralegal.

The following facts with respect to Aurora's knowledge of the bankruptcy filing are largely undisputed:

1.     On August 4, 2009, Stoker informed Aurora that she was filing bankruptcy and that they could not proceed with the foreclosure.

2.     Aurora attempted to verify the bankruptcy filing, but the petition had not yet been filed with the Court.

3.     Later on August 4, 2009, Stoker's counsel sent a fax to Aurora and to its counsel. The fax included proof of the bankruptcy filing.

4.     Prior to the foreclosure, Aurora's counsel contacted Stoker's counsel and discussed the bankruptcy filing.  Aurora's counsel specifically inquired about the nature of Stoker's interest in the property.

5.     Aurora's counsel had an opportunity to stop the foreclosure.  Aurora's counsel did not do so based on the instructions he received from Aurora.

6.     Aurora made its decision to proceed based solely on legal title to the property and its lack of contractual privity with Stoker.  Although Aurora was fully informed that Stoker claimed to have made all payments on the home and claimed an equitable interest, it chose not to investigate this matter to determine whether the Dover Home was estate property.

7.     Aurora never considered the standards set by *Chesnut.*

The Court concludes that Aurora willfully proceeded with the foreclosure with actual knowledge of the commencement of the bankruptcy case and with a blind eye to the requirements of *Chesnut*. Accordingly, Aurora willfully violated the automatic stay.

## Avoidance of Foreclosure

Actions taken in violation of the automatic stay are void unless there is a showing that the automatic stay should be retroactively annulled. *In re Coho Resources, Inc.,* 345 F.3d 338, 344 (5th Cir. 2003). No basis for a retroactive annulment has been shown. The automatic stay was in effect and Aurora had a full awareness of that fact. Accordingly, the foreclosure is avoided.

## Damages

Stoker has remained in the Dover Home. Her damages are minimal. Accepting her uncontroverted testimony as true, she was required to attend multiple court hearings to deal with her bankruptcy case. Of course, some of the hearings that she was required to attend were to address general issues in her bankruptcy case unrelated to the foreclosure.

Although Stoker's bankruptcy case was precipitated by Aurora's planned foreclosure, Aurora is not liable for damages from the filing of the bankruptcy itself. Without the filing of the bankruptcy petition, the foreclosure would have been wholly valid. Stoker's cost of prosecuting the routine bankruptcy is not a damage caused by Aurora.

The Court awards Stoker her mileage to travel to and from hearings regarding the foreclosure and this lawsuit, her lost compensation from missing work, her parking fees, and her reasonable legal fees and costs. The legal fees and costs have been reserved by the parties pending judgment. The balance of the actual damages is $1,040.00.

Stoker also seeks reputational damages based on the fact that a neighbor has circulated a rumor that her home was in foreclosure. There are no compensable damages from such

reputational injury.  The home was in foreclosure; the niceties of whether the foreclosure was stayed by a bankruptcy proceeding would hardly have saved any reputational loss.  Moreover, no result (other than embarrassment) was shown.  Stoker may not seek compensation because her neighbors learned that the home was properly posted for foreclosure.

Stoker's actual damages are $1,040.00.  Because the Court finds that Aurora's actions were willful and because Aurora abdicated its duty to comply with Fifth Circuit law, the Court will award exemplary damages of twice that amount.  The Court notes that it considered imposing substantial exemplary damages.  However, based on Aurora's *good faith* showing during the workout process, the Court finds that equity demands a low amount of exemplary damages.  Nevertheless, for the reasons set forth above, the Court finds that some level of exemplary damages are appropriate as a deterrence against future such conduct.  Accordingly, the total damages are $3,120.00 plus legal fees and costs.

On March 19, 2010 at 2:00 p.m., the Court will conduct an evidentiary hearing on Stoker's legal fees and costs.

### Relief from Automatic Stay

Stoker failed to comply with the original payment obligations under the note to Cornerstone, which note is now held by FNMA.  She then failed to honor her obligations under the first workout with Aurora, a workout that required minimal payments.  She similarly defaulted on the second workout with Aurora.  She failed to follow through with two other workouts arranged with Aurora.  After the filing of her bankruptcy petition, she made less than half of the payments due to the chapter 13 trustee.

The Court concludes that neither Aurora nor FNMA can take any comfort in further promises made by Stoker.  They cannot be adequately protected by a plan that only contains

promises made by a person that continually breaches her most minimal agreements. Cause exists to terminate the stay. Accordingly, after title is restored to Stoker, FNMA and Aurora will be allowed to proceed with foreclosure and Stoker will be allowed to exercise her rights under Texas law.

On March 10, 2010, this Court dismissed Stoker's second bankruptcy case based on her failure to make payments. Although the dismissal order may render this issue moot, the Court has nevertheless issued this opinion based on the possibility of a successful appeal or a successful motion for reconsideration.

### Conclusion

Aurora willfully violated the automatic stay when it foreclosed on the Dover Home. The Court will award Stoker $3,120.00 plus her legal fees and costs for the violation. The foreclosure is avoided. Stoker has flagrantly disregarded her duty to pay Aurora and has breached her obligations to her creditors by failing to perform in her chapter 13 bankruptcy case. Although the foreclosure is avoided, Aurora will be allowed to begin the process anew. Aurora and Stoker will be left with their state law devices.

A separate judgment will be issued after the March 19, 2010 hearing on legal fees and costs.

SIGNED **March 10, 2010.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE